IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SHIPBUILDERS COUNCIL OF AMERICA, )
<u>et</u> <u>al</u>., )
                                )
        Plaintiffs,             )
                                )
    v.                          )   1:07cv665 (LMB/TRJ)
                                )
UNITED STATES DEPARTMENT OF     )
    HOMELAND SECURITY, <u>et</u> <u>al</u>., )
                                )
        Defendants,             )
                                )
SEABULK ENERGY TRANSPORT, INC., )
<u>et</u> <u>al</u>., )
                                )
        Intervenor Defendants.  )

AR 2 4 2008

## MEMORANDUM OPINION

Plaintiffs Shipbuilders Council of America, Crowley Maritime Corporation, and Overseas Shipholding Group, Inc. (collectively "plaintiffs"), have filed this action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, challenging a decision by the United States Coast Guard's National Vessel Documentation Center[1] ("Coast Guard") to issue a coastwise endorsement to the oil tanker <u>Seabulk</u> <u>Trader</u> after work was completed on the vessel in a foreign shipyard.[2]  The owners of the vessel – Seabulk Energy Transport, Inc., and Seabulk Petroleum Transport, Inc.

---

[1] The United States Department of Homeland Security, which oversees the Coast Guard, is also a named defendant in this action.

[2] The Coast Guard's decision involved two vessels – the <u>Seabulk</u> <u>Trader</u> and the <u>Seabulk</u> <u>Challenger</u>.  AR 28.  Only the <u>Seabulk</u> <u>Trader</u> is at issue in this litigation.

(collectively "Seabulk") - have intervened as defendants in this action.  The Coast Guard has filed a motion to dismiss or, in the alternative, for summary judgment.  Plaintiffs and Seabulk have filed cross motions for summary judgment.

For the reasons stated in this memorandum opinion, plaintiffs' motion will be granted, the Coast Guard's motion will be denied, and Seabulk's motion will be denied.

Background

I.   Statutory Framework

The Coast Guard's decision implicates several federal statutes.  Under the Merchant Marine Act of 1920, commonly known as the Jones Act, only vessels that maintain a "coastwise endorsement" may engage in coastwise trade - i.e., trade "between points in the United States."[3]  46 U.S.C. § 55102(b).  This litigation concerns the Second Proviso to the Jones Act, which permanently disqualifies an otherwise eligible vessel that is "later rebuilt outside the United States" from engaging in coastwise trade.  § 12132(b).  Furthermore, "a vessel is deemed to have been rebuilt in the United States only if the entire rebuilding, including the construction of any major component of

---

[3] Congress enacted the Jones Act "in an attempt to protect the American shipping industry against foreign competition."  OSG Bulk Ships, Inc. v. United States, 132 F.3d 808, 809 (D.C. Cir. 1998); see also Marine Carriers Corp. v. Fowler, 429 F.2d 702, 703 (2d. Cir. 1970) ("Like all maritime nations of the world, the United States treats its coastwise shipping trade as a jealously guarded preserve.").

the hull or superstructure, was done in the United States." §
12101(a).

The terminology in the Second Proviso is not defined.  <u>See</u>
<u>Am. Haw. Cruises v. Skinner</u>, 713 F. Supp. 452, 464 (D.D.C. 1989)
("At no time did Congress attempt to draw a line articulating how
much foreign rebuilding would violate the second proviso, nor did
it list the specific components that it considered to be
'major.'").  Rather, the task of clarifying these terms was left
to the supervising agency – first the Secretary of the Treasury,
and now the Coast Guard.  <u>Id</u>.

In 1996, the Coast Guard issued regulations for determining
when a vessel is "rebuilt" outside of the United States:

> A vessel is deemed rebuilt foreign when any
> considerable part of its hull or superstructure is
> built upon or substantially altered outside of the
> United States.  In determining whether a vessel is
> rebuilt foreign, the following parameters apply:
>
> (a) Regardless of its material of construction, a
> vessel is deemed rebuilt when a major component of the
> hull or superstructure not built in the United States
> is added to the vessel.
>
> (b) For a vessel of which the hull and superstructure
> is constructed of steel or aluminum –
>
> (1) A vessel is deemed rebuilt when work performed on
> its hull or superstructure constitutes more than 10
> percent of the vessel's steelweight, prior to the work,
> also known as discounted lightship weight.
>
> (2) A vessel may be considered rebuilt when work
> performed on its hull or superstructure constitutes
> more than 7.5 percent but not more than 10 percent of
> the vessel's steelweight prior to the work.

-3-

> (3) A vessel is not considered rebuilt when work
> performed on its hull or superstructure constitutes 7.5
> percent or less of the vessel's steelweight prior to
> the work.

46 C.F.R. § 67.177(a)-(b).

The Port and Tanker Safety Act of 1978 requires that certain tank and product vessels be equipped with segregated ballast tanks. See 46 U.S.C. §§ 3705, 3706. The statute was enacted to protect against the discharge of oil-contaminated ballast water by permanently allocating certain tanks to carry only ballast water. For those vessels engaged in coastwise trade, "[a] segregated ballast tank . . . required by this chapter . . . shall be installed in the United States." § 3704.

In response to the Exxon Valdez oil spill in Prince William Sound, Alaska, Congress passed the Oil Pollution Act of 1990, 46 U.S.C. § 3703a, which mandates that certain tankers be equipped with double hulls. See Maritrans Inc. v. United States, 342 F.3d 1344, 1348 (Fed. Cir. 2003). Existing single-hull vessels had to be retrofitted with double hulls to remain qualified to operate on waters subject to United States jurisdiction. See 46 U.S.C. § 3703a(c); see generally Maritrans, 342 F.3d at 1348 ("A double hull design provides a reinforced hull in order to minimize the impact of punctures and hull damage."). Single-hull vessels that did not undergo a retrofit would be phased out pursuant to the

-4-

retirement schedule in the statute.[4]

II.   The Present Dispute

On March 11, 2005, Seabulk requested a preliminary determination from the Coast Guard that proposed work in a Chinese shipyard on the Seabulk Trader would not result in a determination (1) that the vessel was "rebuilt" foreign under the Second Proviso to the Jones Act and 46 C.F.R. § 67.177, and (2) that the vessel had its segregated ballast tanks installed outside of the United States under 46 U.S.C. § 3704.   AR 5-11. The proposed work involved the installation of internal bulkheads, or an "inner hull," throughout the vessel's cargo block and a reconfiguration of the vessel's existing ballast tank system.   AR 5-6. Seabulk's submission included estimates of the quantity of steel that would be added to the Seabulk Trader and technical drawings of the new internal bulkheads.   AR 6, 12, 18, 26.

In a four-page letter dated May 20, 2005, the Coast Guard issued a preliminary determination that the proposed work would constitute neither a foreign rebuild nor a foreign installation of segregated ballast tanks.   AR 28-31.   Although the Coast Guard concluded that the addition of a new inner hull would constitute work on the vessel's hull, thereby triggering the applicability

---

[4] The oil tanker at issue in this case, the Seabulk Trader, was built in 1981.   Absent a retrofit of its hull, the vessel would have been forced to retire in 2011.

of the Second Proviso and 46 C.F.R. § 67.177, it determined that the project did not constitute the addition of a "major component" of the hull under § 67.177(a).  AR 29-30.  It further concluded that the added steelweight percentage would fall between 7.97% and 8.57%, and that this would not constitute a rebuild under § 67.177(b).  AR 30.  The Coast Guard also determined that the reconfiguration of the vessel's existing ballast tank system, "which would be undertaken on a voluntary basis in connection with other unrelated modifications, [did] not constitute the <u>installation</u> of <u>required</u> segregated ballast tanks as contemplated by [46 U.S.C. § 3704]."  <u>Id</u>. (emphasis in original).

After completion of the project, Seabulk wrote the Coast Guard on May 8, 2007, advising the agency that the final weight of the components added to the <u>Seabulk Trader</u> constituted 8.15% of the vessel's pre-work steelweight.  AR 44-45.  Seabulk also disclosed that the new bulkheads did not extend into the fore-most and aft-most wing cargo tanks as originally planned.  AR 45.  Those cargo tanks had instead been converted into the vessel's ballast tanks.  <u>Id</u>.  In that letter, Seabulk requested that the Coast Guard issue a certificate of documentation with a coastwise endorsement.  The next day, May 9, 2007, the Coast Guard issued the certificate.  AR 47.

In this litigation, plaintiffs contend that the Coast

-6-

Guard's rebuild determinations with respect to the <u>Seabulk Trader</u>
were arbitrary, capricious, an abuse of discretion, and contrary
to law under 5 U.S.C. § 706(2)(A).  They request that the Court
remand the matter to the Coast Guard with instructions to revoke
the vessel's coastwise endorsement.

<u>Threshold Issues</u>

I.   Subject Matter Jurisdiction

The Coast Guard argues that there is no subject matter
jurisdiction over plaintiffs' claim that the Coast Guard
misapplied the Second Proviso to the Jones Act because the term
"rebuilt" is so broad as to preclude any meaningful judicial
review of its decision that the <u>Seabulk Trader</u> was not rebuilt
foreign.  The argument lacks merit.  There is a "strong
presumption that Congress intends judicial review of
administrative action."  <u>Inova Alexandria Hosp. v. Shalala</u>, 244
F.3d 342, 346 (4th Cir. 2001) (citation omitted).  That
presumption is further amplified in this case given the
legislative history of the Second Proviso.  Although Congress
delegated regulatory authority to the supervising agency to
administer the Jones Act, it also clearly intended that the
courts would retain some role in ensuring compliance with the
statute.  <u>See</u> S. Rep. 84-2395, 84th Cong. 2d Sess. 2-3 (1956),
<u>reprinted in</u> 1956 U.S.C.C.A.N. 3162 ("[T]he bill does not define
the term 'rebuilt,' <u>leaving the interpretation to the courts</u>.  As

the Treasury Department report memorandum . . . notes, the
Supreme Court had adopted a definition of the term . . . .")
(emphasis added).

Furthermore, under 5 U.S.C. § 701(a), agency action is
committed to agency discretion by law only in "those rare
instances where statutes are drawn in such broad terms that in a
given case there is no law to apply." Citizens to Preserve
Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971) (internal
quotations and citation omitted).   Here, there is some law to
apply.  Although terms such as "rebuilt" and "major component" in
the Second Proviso are broad, they are common easily-understood
terms and, therefore, are not so capacious as to preclude
judicial review.  The Coast Guard's determinations must be
reasonable and within the wide boundaries of the statute.  See
EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 260 (1991) (Scalia,
J., concurring) ("[D]eference is not abdication, and it requires
us to accept only those agency interpretations that are
reasonable in light of the principles of construction courts
normally employ."); Menkes v. Dep't of Homeland Sec., 486 F.3d
1307, 1313 (D.C. Cir. 2007) ("[T]he Director might be entitled to
a good deal of deference . . ., but that does not mean the
Director could make such decisions unreasonably.").

It is also important to recognize that Congress crafted the
Second Proviso using language from a nineteenth century judicial

opinion out of this district. See Am. Haw. Cruises, 713 F. Supp.
at 462 (reviewing legislative history of Second Proviso); The
Grace Meade, 25 F. Cas. 1387, 1389 (E.D. Va. 1876) ("[I]f any
considerable part of the hull and skeleton of an old vessel in
its intact condition, without being broken up, is built upon, the
law holds that in such a case it is the old vessel rebuilt . . .
."). As the statutory language originated with the judiciary,
there is no reason to find that the judiciary could not
reasonably review an agency's interpretation of that statutory
language. Cf. The Jack-O-Lantern, 258 U.S. 96, 100 (1922)
(describing the Grace Meade definition as "both sound and
helpful").

Finally, the Coast Guard's own regulations provide a
meaningful source for judicial review.[5] See Inova Alexandria
Hosp., 244 F.3d at 346 ("[R]egulations promulgated by an
administrative agency in carrying out its statutory mandate can
provide standards for judicial review.") (citation omitted).
Using the provisions of 46 C.F.R. § 67.177 as a measure, the
Court can readily evaluate whether the Coast Guard's reasoning

---

[5] The Coast Guard suggests that its regulations lack
meaningful standards on what constitutes a "major component," how
to calculate a vessel's steelweight, or what information must be
collected.  The Court disagrees.  Although the terms in 46 C.F.R.
§ 67.177 grant the Coast Guard wide discretion, they establish
outer boundaries.  For instance, the Coast Guard presumably could
not classify a minor rigging as a "major" component of the
vessel.  Nor could the Coast Guard calculate a vessel's
steelweight without citation to measurements in the record.

and calculations were arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706.

As the agency's own pleadings concede, the Coast Guard's conclusions must be "a rational choice and . . . within the parameters of sound administration of a vague statute." Def. Mem. in Support [117], at 20.  Accordingly, the Coast Guard's jurisdictional argument fails.

II.   Statute of Limitations

Focusing on one allegation in plaintiffs' complaint, that the agency "failed to consider whether work necessary to complete the project would be performed both in foreign and United States shipyards," the Coast Guard contends that plaintiffs are really raising a facial challenge to 46 C.F.R. § 67.177, which allows some percentage of work on a vessel's hull or superstructure to be completed outside the United States.  Such a challenge would be foreclosed by the APA's six year statute of limitations.  See 28 U.S.C. § 2401(a).

As plaintiffs argue, the Coast Guard misconstrues the complaint as a facial challenge.  Rather, plaintiffs are contesting the Coast Guard's specific application of the Jones Act and § 67.177 to the Seabulk Trader.  Under 5 U.S.C. § 706(2)(A), plaintiffs are free to argue that the Coast Guard's determinations with respect to that vessel were arbitrary, capricious, and without evidentiary support.

-10-

## Standard of Review

Having rejected the Coast Guard's preliminary arguments, the merits of the summary judgment motions will be considered. Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1985). In ruling on a motion for summary judgment, a court should accept the evidence of the nonmovant, and all justifiable inferences must be drawn in its favor.[6] See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## Discussion

At issue in this litigation are three Coast Guard findings that Seabulk's work project (1) did not constitute a "major component of the hull" under the Second Proviso to the Jones Act and 46 C.F.R. § 67.177(a); (2) did not exceed the prohibited steelweight thresholds set out in 46 C.F.R. § 67.177(b); and (3) did not constitute the foreign installation of segregated ballast tanks under 46 U.S.C. § 3704. Plaintiffs attack all three findings, which formed the basis of the Coast Guard's decision to

---

[6] On November 9, 2007, the magistrate judge assigned to this case granted plaintiffs' request for limited discovery beyond the administrative record. The Coast Guard now objects to any consideration of this extra record material. The Court does not need to resolve this disagreement because it can decide the summary judgment motions solely on the basis of the administrative record.

grant a coastwise endorsement to the Seabulk Trader, as
arbitrary, capricious, an abuse of discretion, and contrary to
law.

I.  Major Component of the Hull

As discussed above, the Second Proviso to the Jones Act
prohibits "the [foreign] construction of any major component of
the hull or superstructure" on a vessel engaged in coastwise
trade.  46 U.S.C. § 12101(a).  The implementing regulation tracks
this definition.  See 46 C.F.R. § 67.177(a) ("[A] vessel is
deemed rebuilt when a major component of the hull or
superstructure not built in the United States is added to the
vessel.").

In its application to the Coast Guard, Seabulk first argued
that the installation of the inner hull did not trigger the Jones
Act because the inner hull is not part of "the hull."[7]  The Coast
Guard firmly rejected this argument:

> [W]e cannot concur with a conclusion that would find
> that the work required to create a double hull is
> somehow separable from, and not intrinsic to the very
> nature of, the watertight integrity of a vessel that is
> required by law to incorporate that feature. . . .
> [T]he "inner" hull formed by this work . . . is no less
> a part of the hull than is the "outer" hull.  It is
> inseparable from and a part of "the internal structure

---

[7] See AR 8 ("The new [inner hull], which would not affect
the structural integrity of the vessel, would merely serve to
contain the cargo of the Vessels if necessary in the event the
hull (i.e. the watertight envelope) is compromised by creating a
watertight protective space between the cargo and the hull of the
vessel.  Therefore, they are not part of the hull . . . .").

-12-

> below the main deck which provides both the flotation
> envelope and structural integrity of the vessel in its
> normal operations."

AR 30 (citing 46 C.F.R. § 67.3) (emphasis added).

Based on these unchallenged agency findings, the inner hull
and the outer hull each constitute a "component of the hull," and
the installation of an inner hull involves a _fortiori_ the
addition of a "component of the hull" to the vessel under the
Second Proviso.   See _Oxford English Dictionary_ (2d ed. 1989)
(defining "component" as "[a] constituent element or part").   The
only remaining question for the Coast Guard was whether the
_Seabulk Trader_'s inner hull qualified as a "major" component of
the hull.   If so, the inner hull could not be installed in China.

The Coast Guard next concluded that the _Seabulk Trader_'s
inner hull would not constitute a major component of the hull
because the inner hull was not _separable_ from the hull:

> Having determined that the watertight boundary to be
> created by the proposed work is intrinsic to the hull
> itself, we decline to characterize it as a separable
> component that will be added to the Vessels similar,
> for example, to a bulbous bow or additional decks added
> to the superstructure.

_Id_. (emphasis added).   Plaintiffs challenge this analysis.

A.   Agency Deference

The Court concludes that the Coast Guard's
separable/inseparable distinction is not worthy of _Chevron_
deference.   First, and foremost, the formulation is not present
in the Second Proviso or in any existing agency regulations, nor

-13-

was it adopted pursuant to formal rulemaking or another procedure bearing the indicia of a "legislative-type determination."[8]  A.T. Massey Coal Co. v. Holland, 472 F.3d 148, 166 (4th Cir. 2006). Moreover, the formulation was adopted in an opinion letter without any citation to a statutory or regulatory provision. Such opinion letters do not warrant Chevron-style deference.  See Christensen v. Harris County, 529 U.S. 576, 587 (2000).

The agency's interpretation may still garner "respect" only to the extent it has the "power to persuade."  Id.  To determine whether the Coast Guard's interpretation has such persuasive force, the Court must examine "the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements."  Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).

B.   A Permissible Construction of the Jones Act

Without any discussion or analysis of the language in the Jones Act, the Coast Guard's letter of May 20, 2005 declined to characterize the inner hull as a "major component" because, unlike a bulbous bow or deck, it was not a separable component that would be added to the hull.  To further illuminate this

---

[8] An agency's interpretation of its own regulations is entitled to deference.  See Auer v. Robbins, 519 U.S. 452, 462 (1997).  However, Auer deference is not warranted here.  As discussed above, the governing regulation for the "major component" determination, 46 C.F.R. § 67.177(a), merely restates the operative language from the Second Proviso to the Jones Act. Either Chevron or Skidmore deference must be used.

-14-

distinction, the Coast Guard, in its pleadings, observes that the inner hull is not a separable component because it was constructed "by adding steel, which was then built upon steel piece-by-piece." Def. Opposition [30], at 19. By comparison, a bulbous bow or a deck is a separable component because it is "a large and discrete singular component that would be added to the vessel."[9] Id.

This position is not persuasive. The separable/inseparable distinction has no foundation in statute or regulation. The language of the Second Proviso does not hint at such a test. Congress broadly intended to prohibit the foreign construction of "any major component of the hull or superstructure" on a vessel engaged in coastwise trade. 46 U.S.C. § 12101(a). Because the statute does not define "major," the Coast Guard has the authority to develop a metric for determining whether a component of the hull or superstructure is "major." However, such a metric must be reasonable. A reasonable assessment might focus on the physical size, cost, or function of the component, or its importance to the vessel's seaworthiness. However, the manner in which the component is added to the vessel – piece-by-piece or wholesale – is irrelevant to whether the component is "major."

---

[9]   See also Int. Mem. in Support, at 20 ("The major-component test applies only when a module, section, or other such component is constructed or fabricated outside the U.S. apart from the vessel and then 'added to' the vessel.").

-15-

The Coast Guard justifies its separable/inseparable
characterization by referencing Congress' stated purpose for the
Second Proviso:

> [T]he legislative history of the Second Proviso
> indicates that the reason Congress . . . add[ed] the
> major component language was because shipowners were
> circumventing the requirements of the statute by
> engaging foreign shipyards to build complete sections
> of hulls, known as midbodies, and then having U.S.
> shipyards install the midbodies.  Thus, this language
> was intended to prevent the insertion of a full
> component into a vessel, rather than to address[] the
> construction of part of a vessel by building upon the
> hull, piece by piece, as was the case here.

Def. Mem. in Support [117], at 26.  The Coast Guard correctly
summarizes the history behind the Second Proviso.  Congress was
concerned about the ease with which shipowners were circumventing
the Jones Act by having large sections of hulls and
superstructures constructed abroad, towing those sections to the
United States, and installing them wholesale into the vessel.
See S. Rep. 86-1279, 86th Cong., 2d Sess. 2-3 (1960); H. Rep. 86-
1887, 86th Cong., 2d. Sess. 2-3 (1960).  After domestic
shipbuilders cried fowl, Congress amended the statute to its
present-day form.

However, the Coast Guard's reliance on the legislative
history for its separable/inseparable distinction is misguided.
First, although the Second Proviso was drafted in response to the
midbody problem, Congress clearly intended that the scope of the
Second Proviso extend beyond that circumstance:

> The major components of hull or superstructure cited in the bill would certainly apply to vessel sections capable of floating and being towed <u>but</u>, in the context of S. 3189, your committee feels that this interpretation <u>should be expanded to include any component which relates to, or changes, the configuration of the vessel</u>.

S. Rep. 86-1279, at 3 (emphasis added).  The record in this case unambiguously establishes that the addition of an inner hull "relates to" and "changes" the configuration of the <u>Seabulk Trader</u>.

Second, the Coast Guard fails to explain why the instant circumstance is any less pernicious than the one addressed by Congress in the Second Proviso.  Specifically, how does a piecemeal addition of a foreign-built hull or deck onto the vessel materially differ from a wholesale addition of a pre-constructed foreign-built hull or deck onto a vessel?  In either scenario, the shipowner would be securing the foreign construction of a major component of the vessel – the very result that the Jones Act aims to prohibit.  <u>See</u> S. Rep. 86-1279, at 2 (noting that the Jones Act "gave renewed expression to a national policy dating back to the early days of the Republic when it laid down strict qualifications as to . . . construction in U.S. shipyards . . . regarding vessels permitted to engage in the Nation's coastwise trade.").

Third, the separable/inseparable distinction will lead to arbitrary applications of the Jones Act.  Although a deck or a

-17-

component of the hull can be added to a vessel as one discrete pre-constructed structure, it surely can be added piece-by-piece, beam-by-beam, and rivet-by-rivet.  Shipowners could easily frustrate the entire operation of the Second Proviso simply by dictating the manner of installation.

The Coast Guard's reliance on a separable/inseparable distinction bears a striking resemblance to its previous use of a structural/non-structural distinction, which was soundly rejected in <u>American Hawaii Cruises</u>.  In that case, the plaintiff challenged a particular distinction – "structural component" versus "non-structural component" – used by the Coast Guard to determine whether a foreign construction project fell within the Jones Act's vessel rebuild classification.  713 F. Supp. at 465. The district court found that the distinction was not consistent with the Second Proviso, its legislative history, or relevant agency regulations, <u>id</u>. at 467, and was so vague as to frustrate the court's "limited role of saying whether the agency has made a rational connection between the facts found and the choice made." <u>Id</u>. at 468 (internal quotations and citation omitted).  The Coast Guard's vague separable/inseparable distinction, which it used to grant a certificate of coastwise eligibility to the <u>Seabulk Trader</u>, is likewise unfaithful to the text, history, and purpose of the Second Proviso.  For these reasons, the Coast Guard's decision is invalid and must be remanded to the agency for

-18-

further proceedings.

II.   Steelweight Percentage Calculation

The Court's determination on the "major components" element of the Second Proviso is alone sufficient to remand the Coast Guard's decision.  However, in the interest of providing guidance to the agency on remand, plaintiffs' two other main challenges to the Coast Guard's decision will be addressed.

After deciding that the proposed construction of the inner hull did not involve the addition of a "major component of the hull," the Coast Guard assessed the percentage of work that was to be performed on the <u>Seabulk</u> <u>Trader</u> relative to its entire steelweight under 46 C.F.R. § 67.177(b), and concluded that the proposed amount of foreign steel work on the vessel would not constitute a "considerable part" of the hull.  AR 30.  Plaintiffs challenge that conclusion on grounds that the Coast Guard did not properly calculate all the relevant steel work performed on the vessel, and failed to offer an adequate explanation for its decision.

A.   Agency Deference

The Coast Guard's decision to award coastwise certification based on steelweight calculation is a creature of 46 C.F.R. § 67.177(b).  The agency's method of calculating a vessel's steelweight is therefore "controlling unless plainly erroneous or inconsistent with the regulation."  <u>Auer</u>, 519 U.S. at 461

-19-

(internal quotations and citation omitted).

Under the APA's arbitrary-and-capricious standard, 5 U.S.C. § 706(2)(A), the Court must also determine whether the Coast Guard's final decision "was based on a consideration of the relevant factors" and ask "whether there has been a clear error of judgment." Ohio River Valley Envt'l Coalition, Inc. v. Kempthorne, 473 F.3d 94, 102 (4th Cir. 2006) (citation omitted). "Although the scope of review is narrow, the agency must nevertheless explain the evidence which is available, and must offer a rational connection between the facts found and the choice made." Id. at 102-03 (internal quotation and citation omitted).

B.    A Proper Application of 46 C.F.R. § 67.177(b)

1.    Steelweight Calculation

The Coast Guard looked only to the amount of steel that was to be added to the Seabulk Trader, ignoring both the amount of steel removed from the vessel and the modification of existing structures on the vessel. Plaintiffs challenge this approach, arguing that if all the work is aggregated, the total steel work performed in China amounts to at least 9.44% of the vessel's steelweight.

Plaintiffs' argument is not persuasive. The regulation at issue, 46 C.F.R. § 67.177(b), does not specify the manner in which the Coast Guard is to calculate the amount of steelweight

-20-

impacted by a project.  Under longstanding practice, the Coast
Guard "does not consider a 'net effect' of the work performed,
but [uses] the greater of the totals of either the removal or
installation work in its determination."  AR 71.  The agency
followed that approach in this case, looking only to the amount
of steelweight to be added to the <u>Seabulk</u> <u>Trader</u>.  This approach
is not "plainly inconsistent" with § 67.177(b).

> 2.   Adequacy of Agency Explanation

To explain its decision that the proposed steel work did
not involve a foreign rebuild, the Coast Guard stated:

> [U]nder your Option A, the added steelweight percentage
> would be 8.57% and, under your Option B, the added
> steelweight percentage would be 7.97%.  In both cases,
> therefore, the added steelweight percentages fall
> within the threshold of work by which the Vessels <u>may</u>,
> <u>but need not</u>, be considered rebuilt.  However, because
> the percentage in each case falls closer to the lower
> end than to the upper end of that range, and because we
> find no compelling reason to require a contrary
> determination in this case, we find that the vessels
> would not be considered rebuilt in the case of either
> Option A or Option B.

AR 30 (emphasis in original).

Plaintiffs attack this reasoning as inadequate.  The Court
agrees.  Under 46 C.F.R. § 67.177(b)(2), "[a] vessel <u>may</u> be
considered rebuilt" when the work performed on its hull is
between 7.5% and 10% of the vessel's steelweight.  (Emphasis
added).  Within that range, the Coast Guard may not rely simply
on the steelweight calculation.  The regulation plainly
contemplates the use of other factors to guide the decision.  The

Coast Guard's analysis is inconsistent with this regulation because it fails to identify, much less discuss any factor other than steelweight.

In fact, the Coast Guard has a history of regularly approving, without any analysis, foreign work projects that involve between 7.5% and 10% of a vessel's steelweight.[10]  The administrative record does not contain a single instance where the agency determined that a vessel was rebuilt foreign when its steel work fell within that range.  If the Coast Guard wants to adopt a bright-line 10% steelweight threshold, it must use established notice-and-comment rulemaking procedures, not informal – and confidential – decision letters.

The Coast Guard's explanation also violates the APA's prohibition on arbitrary and capricious decision making.  When the steelweight calculation falls within the 7.5% to 10% range, the Coast Guard has considerable discretion to determine on a case-by-case basis whether the work constitutes a rebuild.  It still must exercise that discretion reasonably.  In this case, the Coast Guard's explanation is devoid of any analysis.  Having failed to identify the relevant factors, the agency's assertion that were "no compelling reasons to require a contrary determination" is a meaningless statement.  Accordingly, the

---

[10] See AR 73 (8.23% of steelweight); AR 75 (7.83% of steelweight); AR 100 (8.31% of steelweight); AR 109 (9.40% of steelweight); AR 113 (8.11% of steelweight).

-22-

Court cannot conclude that the agency has reached a rational, non-arbitrary conclusion.

III. Segregated Ballast Tank Determination

As a final matter, the Coast Guard concluded that the reconfiguration of the Seabulk Trader's segregated ballast tanks would not violate the Port and Tanker Safety Act of 1978, 46 U.S.C. § 3704:

> [A] reconfiguration of the port and starboard segregated ballast tanks will occur as a result of building a tank boundary.  However, we concur that this reconfiguration, which will be undertaken on a voluntary basis in connection with other unrelated modifications, does not constitute the installation of required segregated ballast tanks as contemplated by [46 U.S.C. § 3704].

AR 30 (emphasis in original).

A.    Agency Deference

The Coast Guard explained its segregated ballast tank determination in its May 20, 2005 opinion letter.  There is no indication that the agency used any formal procedures, nor did its reasoning, which was stated in two sentences, contain thorough analysis or other indicia of a legislative-type determination.  Accordingly, Chevron deference is not appropriate.  See A.T. Massey Coal, 472 F.3d at 166.  The Coast Guard's interpretation of 46 U.S.C. § 3704 receives only Skidmore deference based on its "power to persuade."

B.    A Permissible Construction of the Port and Tanker Safety Act

-23-

Under the Port and Tanker Safety Act, 46 U.S.C. §
3705(a)(1), new crude oil tankers must be equipped with
segregated ballast tanks.  For those vessels engaged in coastwise
trade, the Act mandates that the tanks be installed in the United
States:

> A segregated ballast tank, a crude washing system, or
> an inert gas system, required by this chapter or a
> regulation prescribed under this chapter, on a vessel
> entitled to engage in the coastwise trade under chapter
> 551 of this title shall be installed in the United
> States (except trust territories).  A vessel failing to
> comply with this section may not engage in the
> coastwise trade.

46 U.S.C. § 3704.

All parties agree that the Seabulk Trader must, as a matter
of law, be equipped with segregated ballast tanks.  The Coast
Guard asserts, however, that § 3704 applies only to the original
installation of a vessel's segregated ballast tanks because only
that installation was "required" by the Port and Tanker Safety
Act.  It next contends that the work in China on the Seabulk
Trader involved a mere "reconfiguration" of the vessel's ballast
system, as opposed to an installation.  Neither position is
persuasive.

1.   A "required" ballast tank

The Coast Guard first argues that § 3704 has no
applicability to the Seabulk Trader because its original
segregated ballast system was installed in the United States in
1981.  This argument is based on a tortured interpretation of the

-24-

statute.  Neither the statutory language nor the legislative history of § 3704 contains the adjective "original" or suggests such a limitation.

Rather, the statutory language, as codified, is pellucidly clear: "[a] segregated ballast tank . . . required by this chapter or a regulation prescribed under this chapter . . . shall be installed in the United States."  The adjective "required" clearly modifies "segregated ballast tank," not the installation of the tank as argued by the Coast Guard.[11]  Therefore, if a segregated ballast tank is "required" by law for the vessel, that tank "shall be installed" in the United States in order for that vessel to engage in coastwise trade.

Morever, the legislative history of the Port and Tanker Safety Act supports the conclusion that any installation of a required ballast tank must be performed in the United States. See H.R. Rep. 95-1384(I), 95th Cong., 2d Sess. 22 (1978), as

---

[11] Seabulk invokes the original language of the Port and Tanker Safety Act to buttress the Coast Guard's position.  See Port & Tanker Safety Act of 1978, P.L. 95-474, 92 Stat. 1471, 1486 (1978) ("[T]he installation of segregated ballast tanks . . . required by regulations issued hereunder, on a vessel which is entitled to engage in coastwise trade . . . shall be effected within the United States.").  That language is admittedly ambiguous as to what the word "required" modifies – "the installation . . . required by regulations" or the "segregated ballast tanks . . . required by regulations."  However, the codification of the Port and Tanker Safety Act resolves the ambiguity.  Cf. Carolina, Clinchfield & Ohio Ry. v. ICC, 593 F.2d 1305, 1310 (D.C. Cir. 1979) ("[P]articularly because the codified language admits of little doubt, if any, we do not find the mere ambiguity in the earlier language of much help.").

<u>reprinted</u> <u>in</u> 1978 U.S.C.C.A.N. 3270, 3291 ("[T]he Committee has included a requirement that <u>any</u> installation of segregated ballast tanks, crude oil washing systems, or inert gas systems shall be accomplished, for U.S. vessels in the coastwise trade, within the United States, its territories, or possessions.") (emphasis added).

Finally, the Court's construction of § 3704 is consistent with the congressional purpose behind the statute, which was to place the installation of segregated ballast tanks in the same league as a vessel rebuild under the Second Proviso to the Jones Act. <u>See</u> <u>id</u>. ("While . . . it can be argued that these changes may not constitute major conversions or rebuilding, they are sufficiently similar to justify the same requirement."). The Coast Guard has failed to offer any rational justification for why Congress would want only the original installation of a required ballast tank, as opposed to the second or third installation, to be performed in the United States.

The <u>Seabulk</u> <u>Trader</u> must, as a matter of law, be equipped with segregated ballast tanks. Section 3704 therefore mandates that those segregated ballast tanks be installed in the United States. The Coast Guard's contrary interpretation was erroneous.

2. An "installation"

The Coast Guard next characterizes the work done on the <u>Seabulk</u> <u>Trader</u>, not as an installation, but rather as a

-26-

"reconfiguration" of the vessel's ballast tanks.  The problem with that approach is that the term "reconfiguration" does not appear in the statute.

Section 3704 requires that ballast tanks be "installed" in the United States.  The plain meaning of the word "installed" is well established – "To place (an apparatus . . .) in a position for service or use."  Oxford English Dictionary (2d ed. 1989). Whether or not a ballast tank has been "installed" on a vessel requires the factfinder to collect specific information about the work performed on that tank to place it in a position for service.

The administrative record contains very little information about the work performed on the Seabulk Trader's ballast tanks. Before entering the Chinese shipyard, the vessel had two segregated ballast tanks located midship – one to port and one to starboard ("No. 4a wing tanks").  Upon leaving the shipyard, those wing tanks had been converted into cargo use.  In addition, four cargo tanks – two fore and two aft – had been converted into ballast tanks ("No. 1 tanks" and "No. 6 tanks").  Finally, eight narrow ballast tanks, four on each side of the vessel, were constructed between the outer hull and the new inner hull.

Simply knowing the locations of the Seabulk Trader's former and current ballast tanks has no relevance in determining whether those current tanks were "installed" in the Chinese shipyard.

-27-

First, the agency did not determine the amount of ballast capacity required by law for the <u>Seabulk</u> <u>Trader</u>, thereby frustrating any identification of which of the vessel's ballast tanks were "required."[12]  Second, the record is silent as to the nature and quantity of work needed to convert the <u>Seabulk</u> <u>Trader</u>'s cargo tanks into ballast service.  Accordingly, the Coast Guard's determination that the <u>Seabulk</u> <u>Trader</u>'s segregated ballast tanks had not been "installed" foreign lacked any evidentiary foundation and, therefore, violated the APA's prohibition against arbitrary and capricious decision making.

### Conclusion

For these reasons, plaintiffs' Motion for Summary Judgment will be granted, the Coast Guard's Motion to Dismiss or, in the Alternative, Summary Judgment will be denied, and Seabulk's Motion for Summary Judgment will be denied.

Because the existing record does not support the Coast Guard's issuance of the coastwise endorsement for the <u>Seabulk</u> <u>Trader</u>, the Court will remand this matter to the Coast Guard with instructions to revoke the coastwise endorsement.  The agency, in its discretion, may initiate further proceedings with respect to the <u>Seabulk</u> <u>Trader</u> so long as those proceedings are consistent

---

[12]  According to Seabulk, the eight narrow tanks added ballast capacity in <u>excess</u> of that required by law and, therefore, are not "required" by the Port and Tanker Safety Act. <u>See</u> Int. Reply [131], at 8 n.6.

-28-

with this opinion.

A separate order consistent with this Memorandum Opinion will be issued.

Entered this _24th_ day of April, 2008.


Alexandria, Virginia

                                    /s/
                              Leonie M. Brinkema
                              United States District Judge

-29-