IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MAR 1 7 2011

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

SHIPBUILDERS COUNCIL OF AMERICA, )
et al., )
                                 )
        Plaintiffs,              )
                                 )
    v.                           )    1:07cv665 (LMB/TRJ)
                                 )
UNITED STATES DEPARTMENT OF      )
    HOMELAND SECURITY, et al.,   )
                                 )
        Defendants,              )
                                 )
SEABULK ENERGY TRANSPORT, INC.,  )
et al.,                          )
                                 )
        Intervenor Defendants.   )

### MEMORANDUM OPINION

Plaintiffs Shipbuilders Council of America, Crowley Maritime
Corporation, and Overseas Shipholding Group, Inc. filed this
action under the Administrative Procedure Act ("APA"), 5 U.S.C.
§ 701 et seq., challenging a decision by the United States Coast
Guard's National Vessel Documentation Center ("Coast Guard")[1] to
issue a coastwise endorsement to the oil tanker Seabulk Trader
after work was completed on the vessel in a foreign shipyard.[2]  The

---

[1] The United States Department of Homeland Security, which
oversees the Coast Guard, is also a named defendant in this
action.

[2] The Coast Guard's decision involved two sister vessels –
the Seabulk Trader and the Seabulk Challenge.  Only the Seabulk
Trader is at issue in this litigation.  A companion case
involving the Seabulk Challenge has been stayed pending the
disposition of this case.  See Shipbuilders Council of Am., Inc.
v. U.S. Dep't of Homeland Security, No. 1:08cv680 (E.D. Va.),
Order of Nov. 7, 2008 [Dkt. No. 27].

owners of the vessel – Seabulk Energy Transport, Inc. and Seabulk
Petroleum Transport, Inc. (collectively "Seabulk") – have
intervened as defendants in this action.

After several rounds of proceedings before the Coast Guard,
this Court, and the United States Court of Appeals for the Fourth
Circuit, plaintiff Overseas Shipholding Group, Inc. ("OSG")
returns to this Court to challenge the Coast Guard's most recent
determination that certain piping and valve work done on the
Seabulk Trader to convert several cargo tanks into segregated
ballast tanks was not a prohibited foreign "installation" of such
tanks, in violation of 46 U.S.C. § 3704.

Plaintiff OSG has filed a Motion for Summary Judgment [Dkt.
No. 214], asking this Court to overturn the Coast Guard's
determination as "arbitrary, capricious, an abuse of discretion,
or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A),
and to remand the case to the Coast Guard with instructions to
revoke the Seabulk Trader's coastwise endorsement. Defendants
National Vessel Documentation Center, the Coast Guard, and the
United States Department of Homeland Security have also filed a
Motion for Summary Judgment [Dkt. No. 217], as have intervenor
defendants Seabulk [Dkt. No. 220].

For the reasons stated in this Memorandum Opinion,
plaintiff's motion will be denied, and the defendants' and
intervenor defendants' motions will be granted.

-2-

## I. Background

### A. Statutory and Regulatory Framework

In its role as the federal agency with the power to
administer vessel documentation laws, the United States Coast
Guard regulates the issuance of "certifications of documentation"
to vessels that participate in coastwise trade, or domestic
shipping trade between points within the United States. The Coast
Guard's decision in this case to issue such a certification of
documentation with a coastwise endorsement to the Seabulk Trader
implicates several intersecting federal statutes. Those statutes,
among other things, govern vessel specifications and safety
standards and seek to protect the economic interests of United
States shipyards.

Under the first of those statutes, the Merchant Marine Act
of 1920, commonly known as the Jones Act, only vessels that
maintain a "coastwise endorsement" may engage in coastwise trade
– i.e., trade "between points in the United States." 46 U.S.C.
§ 55102(b). The Second Proviso to the Jones Act permanently
disqualifies from coastwise service any otherwise eligible vessel
that is "later rebuilt outside the United States." See id.
§ 12132(b). The Jones Act is an avowedly protectionist statute,
which Congress enacted "in an attempt to protect the American
shipping [and shipbuilding] industry against foreign
competition." OSG Bulk Ships, Inc. v. United States, 132 F.3d
808, 809 (D.C. Cir. 1998). Accordingly, "a vessel is deemed to

have been rebuilt in the United States only if the entire
rebuilding, including the construction of any major component of
the hull or superstructure, was done in the United States." 46
U.S.C.A. § 12101(a).

The Jones Act itself does not define the terms "rebuilt" or
"rebuilding." Rather, the task of clarifying those terms was
left to the supervising agency – first the Secretary of the
Treasury, and now the Coast Guard. See Am. Haw. Cruises v.
Skinner, 713 F. Supp. 452, 464 (D.D.C. 1989). In 1996, the Coast
Guard issued regulations for determining when a vessel has been
"rebuilt" outside of the United States. Those regulations
require a determination as to whether any "major component" has
been added to the vessel, and whether work has been performed on
a "considerable part" of the vessel's hull or superstructure:

> A vessel is deemed rebuilt foreign when any
> considerable part of its hull or superstructure is
> built upon or substantially altered outside of the
> United States. In determining whether a vessel is
> rebuilt foreign, the following parameters apply:
>
> (a) Regardless of its material of construction, a
> vessel is deemed rebuilt when a major component of the
> hull or superstructure not built in the United States
> is added to the vessel.
>
> (b) For a vessel of which the hull and superstructure
> is constructed of steel or aluminum –
>
>> (1) A vessel is deemed rebuilt when work performed
>> on its hull or superstructure constitutes more than
>> 10 percent of the vessel's steelweight, prior to
>> the work, also known as discounted lightship
>> weight.
>>
>> (2) A vessel may be considered rebuilt when work

-4-

> performed on its hull or superstructure constitutes
> more than 7.5 percent but not more than 10 percent
> of the vessel's steelweight prior to the work.
>
> (3) A vessel is not considered rebuilt when work
> performed on its hull or superstructure constitutes
> 7.5 percent or less of the vessel's steelweight prior
> to the work.

46 C.F.R. § 67.177(a)-(b).

In addition to these general statutory and regulatory provisions governing all coastwise vessels, the Oil Pollution Act of 1990 ("OPA") provides that all oil tankers in the coastwise trade must be "equipped with a double hull" or be phased out of service by a specified date. 46 U.S.C. § 3703a(a). The OPA was passed in response to the devastating Exxon Valdez oil spill in Prince William Sound, Alaska, and requires all existing single-hull vessels to be retrofitted with double hulls to remain qualified to operate on waters subject to United States jurisdiction. See id. § 3703a(c); see also Maritrans Inc. v. United States, 342 F.3d 1344, 1348 (Fed. Cir. 2003) (explaining that a "double hull design provides a reinforced hull in order to minimize the impact of punctures and hull damage"). Single-hull vessels that do not undergo the required retrofitting must be phased out pursuant to the retirement schedule in the statute.

Finally, the Port and Tanker Safety Act of 1978 ("PTSA") requires that certain tank and product vessels be equipped with

-5-

"segregated ballast tanks." See 46 U.S.C. §§ 3705, 3706.[3] The
statute was specifically enacted to protect against a major
source of pollution - the practice of filling empty oil cargo
tanks with sea water for ballast and then discharging the oil-
contaminated contents into the sea. See Pub. L. No. 95-474, 92
Stat. 1471 (Oct. 17, 1978); H.R. Rep. 95-1384(I), 1978
U.S.C.C.A.N. 3270 (July 21, 1978). To halt that practice, the
PTSA requires vessels to have a certain ratio of ballast tanks to
oil cargo tanks, and further requires those ballast tanks to be
"segregated" from the oil tanks, such that they are permanently
allocated to carry only ballast water. See 46 U.S.C. §§ 3701(3);
3706(a); see also 33 C.F.R. §§ 157.03; 157.10d(b)(2).

Moreover, for those vessels engaged in coastwise trade, the
PTSA mandates that all segregated ballast tanks required by the
statute must be installed in the United States:

A segregated ballast tank, a crude oil washing system,
or an inert gas system, required by this chapter or a
regulation prescribed under this chapter, on a vessel
entitled to engage in the coastwise trade under chapter
551 of this title shall be installed in the United
States (except the trust territories). A vessel
failing to comply with this section may not engage in
the coastwise trade.

46 U.S.C. § 3704. As with the Second Proviso of the Jones Act,
46 U.S.C. § 3704 is a protectionist provision. It is the proper
interpretation of that provision - and in particular, the

_____

[3] Ballast is any material that serves to add bulk or weight
to a vessel and thereby provides additional stability.

-6-

definition of a prohibited foreign "install[ation]" - that is
presently at issue in this litigation.

## B. Seabulk Trader Retrofitting

The Seabulk Trader is an oil tanker owned by Seabulk and
used exclusively in the coastwise trade. The Seabulk Trader was
built in 1981, after the PTSA was enacted, and therefore
satisfied the PTSA's requirements concerning the installation of
segregated ballast tanks when it was first built. See Admin.
Record ["A.R."] at 47.[4] However, the OPA, passed in 1990,
required the Seabulk Trader to be retrofitted and equipped with a
double hull, or to be phased out of service by 2011. See 46
U.S.C. § 3703a. Accordingly, to keep the vessel in the coastwise
service, Seabulk sought to meet the OPA's requirements by
converting the vessel's double bottom and single side to a
configuration that would fully meet the technical double hull
specifications of the OPA. See A.R. at 2.

On March 11, 2005, Seabulk submitted a request to the Coast
Guard, seeking a preliminary determination of whether the work it
proposed to undertake to retrofit the Seabulk Trader could be
performed in a foreign shipyard, or whether such foreign work
would adversely affect the vessel's coastwise trade eligibility.
Specifically, Seabulk sought a preliminary ruling that its

---

[4] "A.R." refers to the portions of the Certified
Administrative Record filed in this case on October 5, 2007, and
later supplements. See Dkt. Nos. 59, 66, and 71.

proposed work on the Seabulk Trader in a Chinese shipyard would not result in a finding (1) that the vessel was "rebuilt" foreign under the Second Proviso to the Jones Act and 46 C.F.R. § 67.177, or (2) that the vessel had its segregated ballast tanks installed outside of the United States, in violation of 46 U.S.C. § 3704. A.R. at 5-11. The proposed work involved the installation of internal bulkheads, or an "inner hull," throughout the vessel's cargo block, and a reconfiguration of the vessel's existing ballast tank system. Id. at 5-6.[5]

In a four-page letter dated May 20, 2005, the Coast Guard issued a preliminary determination that the proposed work would constitute neither a foreign rebuild nor a foreign installation of segregated ballast tanks. See A.R. at 28-31. With regard to the segregated ballast tank issue, the Coast Guard determined that the reconfiguration of the vessel's existing ballast tank system, "which would be undertaken on a voluntary basis in connection with other unrelated modifications, [would] not constitute the *installation* of *required* segregated ballast tanks as contemplated by [46 U.S.C. § 3704]." Id. (emphasis in original).

---

[5] Specifically, Seabulk informed the Coast Guard that the Seabulk Trader's required segregated ballast tanks were originally located in the vessel's double bottom (or inner-bottom) tanks, and in the vessel's "No. 4a wing tanks," at midship. Seabulk's request for a preliminary rebuild determination proposed reconfiguring the ballast capacity met by the No. 4a tanks into the double hull, and then converting the No. 4a tanks into oil cargo tanks. See A.R. at 5-6.

After completion of the project, Seabulk wrote to the Coast Guard on May 8, 2007, advising the agency of several deviations from its initial retrofitting proposal. For example, Seabulk disclosed that the new internal bulkheads did not extend into the fore-most and aft-most wing cargo tanks, as originally planned. A.R. at 45. Rather, although the reconfiguration of the "wing tanks" ballast capacity into the double hull had taken place as planned, the infeasibility of the original proposed design required the conversion of several additional cargo tanks, the "Nos. 1 and 6 tanks," into segregated ballast tanks, as well. Id.[6] In its May 8, 2007 letter, Seabulk nonetheless requested that the Coast Guard issue a certificate of documentation with a coastwise endorsement to the Seabulk Trader. The next day, May 9, 2007, the Coast Guard issued the certificate. See A.R. at 47.

### C. Prior Proceedings Before This Court - "Shipbuilders I"

On July 9, 2007, plaintiff OSG, and then co-plaintiffs Shipbuilders Council of America, Inc. and Crowley Maritime

---

[6] Before entering the Chinese shipyard, the Seabulk Trader had two segregated ballast tanks located midship - one to port and one to starboard ("No. 4a wing tanks"). Upon leaving the shipyard, those wing tanks had been converted into cargo use. In addition, four former cargo tanks - two fore and two aft - had been converted into ballast tanks ("No. 1 tanks" and "No. 6 tanks"). Finally, eight narrow ballast tanks, four on each side of the vessel, were constructed between the outer hull and the new inner hull. However, it appears that those eight new narrow tanks were not "required" to meet the vessel's statutorily-mandated segregated ballast capacity.

-9-

Corporation,[7] lodged their initial challenge in this Court as to the Coast Guard's determination that the Seabulk Trader was still eligible for a coastwise endorsement. Plaintiffs contended that the Coast Guard's determinations that (a) the Seabulk Trader had not been rebuilt in a foreign port in violation of the Jones Act, and (b) its required segregated ballast tanks had not been "installed" in violation of 46 U.S.C. § 3704 were arbitrary, capricious, an abuse of discretion, and contrary to law under 5 U.S.C. § 706(2)(A). Plaintiffs therefore requested that the Court remand the matter to the Coast Guard with instructions to revoke the Seabulk Trader's coastwise endorsement.

On April 24, 2008, the Court issued a Memorandum Opinion, declining to give deference to the Coast Guard as to its analysis of whether the Seabulk Trader had undergone a foreign rebuild in violation of the Jones Act, and finding that the vessel had been rebuilt in a foreign port and thereby forfeited its coastwise privileges. As to the segregated ballast issue, the Court rejected the Coast Guard's interpretation that 46 U.S.C. § 3704 did not apply to installations of segregated ballast tanks "voluntarily undertaken," but found that there was insufficient evidence in the record concerning the actual work done to the Seabulk Trader's segregated ballast tanks to determine whether

---

[7]  Shipbuilders Council of America, Inc. and Crowley Maritime Corp. did not participate in the remand proceedings before the Coast Guard, and have not filed any motions before this Court on the instant issue.

-10-

any required segregated ballast tanks were installed in violation

of 46 U.S.C. § 3704:

> Whether or not a ballast tank has been "installed"
> on a vessel requires the factfinder to collect specific
> information about the work performed on that tank to
> place it in a position for service. . . .  The
> administrative record contains very little information
> about the work performed on the Seabulk Trader's
> ballast tanks. . . .
>
> Simply knowing the locations of the Seabulk
> Trader's former and current ballast tanks has no
> relevance in determining whether those current tanks
> were "installed" in the Chinese shipyard.  First, the
> agency did not determine the amount of ballast capacity
> required by law for the Seabulk Trader, thereby
> frustrating any identification of which of the vessel's
> ballast tanks were "required."  Second, the record is
> silent as to the nature and quantity of work needed to
> convert the Seabulk Trader's cargo tanks into ballast
> service.  Accordingly, the Coast Guard's determination
> that the Seabulk Trader's segregated ballast tanks had
> not been "installed" foreign lacked any evidentiary
> foundation and, therefore, violated the APA's
> prohibition against arbitrary and capricious decision
> making.

Shipbuilders Council of Am. v. U.S. Dep't of Homeland Security,

551 F. Supp. 2d 447, 459-60 (E.D. Va. 2008) ("Shipbuilders I").

The Court therefore remanded that matter to the Coast Guard,

indicating that "[t]he agency, in its discretion, may initiate

further proceedings . . . so long as those proceedings are

consistent with this opinion."  Id. at 460.

## D.  Appeal to the Fourth Circuit

The Coast Guard appealed all issues relating to the Court's

determination that the Seabulk Trader had been rebuilt foreign to

the United States Court of Appeals for the Fourth Circuit.  See

Dkt. No. 194. The Coast Guard did not, however, appeal the Court's holding that the PTSA's "installation" provision, 46 U.S.C. § 3704, applies to subsequent as well as original installations of required segregated ballast tanks. See Shipbuilders I, 551 F. Supp. 2d at 558; see also Shipbuilders Council of Am. v. U.S. Coast Guard, 578 F.3d 234 (4th Cir. 2009).

On August 21, 2009, the Fourth Circuit reversed and remanded, holding that the Coast Guard's interpretation of the Jones Act's Second Proviso rebuild provision, and its application of the implementing regulations at 46 U.S.C. § 67.177, were valid and reasonable. The Fourth Circuit also concluded that the district court had not accorded the agency's interpretation of the "major component" and "considerable part" tests in that regulation sufficient deference. See Shipbuilders Council, 578 F.3d at 245-46. The Fourth Circuit therefore remanded the case to this Court, with instructions to remand the matter to the Coast Guard for further proceedings on two remaining issues: (1) the exercise of discretion by the Coast Guard on the "considerable part" portion of 46 U.S.C. § 67.177; and (2) the segregated ballast tank issue. Id.

On January 19, 2010, this Court remanded the Coast Guard's initial decision back to the agency for reconsideration consistent with the opinion of the Fourth Circuit. See Dkt. No. 206. The remand Order provided, in pertinent part, that:

[T]he decision to grant a coastwise endorsement to

-12-

the Seabulk Trader be and is remanded to the Coast
Guard for reconsideration of its conclusion as to the
considerable part and segregated ballast tank issues,
said reconsideration to be consistent with the opinion
of the Fourth Circuit in Shipbuilders Council of
America, et al. v. United States Coast Guard, et al.,
578 F.3d 234 (4th Cir. 2009).

See id. In particular, what remained to be determined by the

Coast Guard with respect to 46 U.S.C. § 3704 was whether the

piping and valve work completed on the Seabulk Trader in China to

reconfigure the vessel's segregated ballast system constituted a

prohibited foreign "installation" of required segregated ballast

tanks.  See Admin. Supp. ["A.S."] at 183.[8]

### E.  Proceedings on Remand

On remand, the Coast Guard's National Vessel Documentation

Center ("NVDC") accepted this Court's holding in its April 24,

2008 Memorandum Opinion that 46 U.S.C. § 3704 applies to the

installation of any required segregated ballast tank.  See id.

("We accept that decision.  Thus, it is now settled law that 46

U.S.C. § 3704 applies to the 'installation' of any 'required'

segregated ballast tank.")  In light of that finding, the Coast

Guard sought to answer two questions: (1) which of the Seabulk

Trader's segregated ballast tanks are "required" for it to

satisfy applicable segregated ballast capacity requirements under

the Port and Tanker Safety Act of 1978; and (2) whether any of

---

[8] "A.S." refers to the Supplemental Administrative Record
filed in this case on November 30, 2010, after the conclusion of
the proceedings on remand.  See Dkt. No. 213.

those segregated ballast tanks were "installed" in a foreign shipyard. Id.

Before reaching its decision, the NVDC received six submissions from the plaintiffs and the intervenor defendants. See A.S. at 179; see also id. Tabs 2, 3, 5, 7, and 9. The NVDC also sought the expertise of the Coast Guard's Naval Architecture Division ("NAD"), asking NAD to review the parties' submissions and provide technical analysis and proposed factual findings. See A.S. Tab 4. On August 2, 2010, the NVDC, based on a recommendation by NAD, requested additional information from Seabulk; Seabulk provided that supplemental information on August 6, 2010. See A.S. Tabs 11, 13, 14.

On August 23, 2010, NAD issued its analysis and factual findings to the NVDC. A.S. at 189-90. After reviewing the modifications made to the Seabulk Trader's segregated ballast system, NAD found that the vessel met the regulatory ballast requirements without using the Nos. 2, 3, 4, and 5 "wing" segregated ballast tanks, but that the vessel required the conversion of the Nos. 1 and 6 tanks into segregated ballast tanks to keep the draft and trim within allowable limits. See id. at 189. NAD also found that the conversion of cargo tanks No. 1 (P/S) and No. 6 (P/S) to segregated ballast service entailed the removal of the deep well cargo pump and the installation of a new piping section and one control valve to connect each tank to the existing centerline segregated ballast

-14-

tank header.  See id. at 190.  However, NAD concluded that "[n]o

tank vent or structural modifications were necessary" to convert

the Nos. 1 and 6 cargo tanks into segregated ballast tanks.  Id.

On August 31, 2010, the Coast Guard's NVDC issued its final

determination, see A.S. at 178-88, relying on the following

facts:

> (i) that the Nos. 2, 3, 4, and 5 wing tanks created by
> the installation of new inner sides, and which are
> equipped and usable as segregated ballast tanks, were
> installed in a foreign shipyard but are not necessary
> to meet applicable ballast capacity regulatory
> requirements; and
>
> (ii) that the Nos. 1 and 6 Tanks were originally
> installed to serve as cargo tanks in a U.S. shipyard;
> and
>
> (iii) that the Nos. 1 and 6 Tanks now serve as
> segregated ballast tanks and, in that service, are
> necessary to meet applicable ballast capacity
> regulatory requirements; and
>
> (iv) that it was not necessary to alter the Nos. 1 and
> 6 Tanks, as tanks, in shape, form, location or
> structure in order to change their service from cargo
> to segregated ballast; but
>
> (v) that the work done in a foreign shipyard needed to
> change the Nos. 1 and 6 Tanks from cargo service to
> segregated ballast service consisted of the removal of
> deep well cargo pumps and, in terms of installation,
> the installation of a new piping section and one
> control valve to connect each Tank to a pre-existing
> centerline SBT [segregated ballast tank] header; and
>
> (vi) that, although it could not be confirmed, but has
> also not been contested, the cost of such conversion
> constituted a reported $4,330, or 0.0043%, of the total
> cost of the retrofit project for the Vessel.

Id. at 185.  After considering the text of 46 U.S.C. § 3704 and

its legislative history, the parties' arguments, and various

-15-

hypotheticals, the Coast Guard's NVDC concluded that the reconfiguration of the Seabulk Trader's segregated ballast system did not violate the PTSA, and that the vessel "should remain entitled to [a] Certificate[] of Documentation with endorsements for coastwise trade." Id. at 189. Specifically, the agency held that:

> [T]he nature and quantity of work done in this case (specifically, the installation of piping in connection with the Nos. 1 and 6 Tanks, which Tanks had been installed in a U.S. shipyard and were not otherwise altered in a foreign shipyard in order to serve a segregated ballast function), did not constitute the installation of segregated ballast tanks within the meaning of 46 U.S.C. § 3704.

Id. at 188.[9]

## F.  The Present Dispute

On October 29, 2010, OSG - the only remaining plaintiff electing to challenge the Coast Guard's determination on remand - moved the Court to reopen this matter.  OSG explicitly declined to challenge any of the Coast Guard's findings with respect to the "considerable part" test for foreign rebuilds under the Jones Act. See Pl.'s Br. in Supp. of Mot. to Reopen at 2 n.2 ("The Coast Guard also determined that the vessel should not be considered rebuilt under the considerable part test.  OSG did not contest this issue before the agency and does not intend to press it here.").  Rather, OSG seeks judicial review only of the Coast

---

[9]  The NVDC also reached a decision with respect to the "considerable part" test on remand, finding that the work done on the Seabulk Trader did not constitute a foreign rebuild under that test.  See A.S. at 179-83.  That determination, however, is not at issue here.

Guard's determination that the work performed on the Seabulk
Trader's required segregated ballast tanks did not contravene 46
U.S.C. § 3704.

The Court granted OSG's Motion to Reopen this civil action,
and will now resolve the segregated ballast dispute on the
parties' cross-motions for summary judgment.

## II. Standard of Review

Summary judgment is appropriate if there is no genuine issue
as to any material fact and the moving party is entitled to
judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex
Corp. v. Catrett, 477 U.S. 317, 322-23 (1985). A genuine issue of
material fact exists "if the evidence is such that a reasonable
jury could return a verdict for the nonmoving party." Anderson v.
Liberty Lobby, Inc. 477 U.S. 242, 247-48 (1986). In ruling on a
motion for summary judgment, a court must accept the evidence of
the nonmoving party, and all justifiable inferences must be drawn
in its favor. See Anderson, 477 U.S. at 255.

The Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et
seq., confines judicial review of executive branch decisions to
the administrative record of proceedings before the pertinent
agency. See 5 U.S.C. § 706; see also Camp v. Pitts, 411 U.S. 138,
142 (1973). As such, there can be no genuine issue of material
fact in an APA action, and the legal questions presented in this
civil action are therefore ripe for resolution on cross-motions
for summary judgment. See Am. Forest Res. Council v. Hall, 533 F.

Supp. 2d 84, 89 (D.D.C. 2008) (quoting Occidental Eng'g Co. v. INS, 753 F.2d 766, 769-70 (9th Cir. 1985)) ("[I]t is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'").

## III. Discussion

The sole remaining issue before the Court is whether the Coast Guard's decision to grant a coastwise endorsement to the Seabulk Trader, on the grounds that the work performed on the Nos. 1 and 6 cargo tanks of that vessel to convert them into required segregated ballast tanks was not a foreign "installation" of segregated ballast tanks and therefore did not violate 46 U.S.C. § 3704, was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See 5 U.S.C. § 706(2)(A).

For the reasons stated below, the Coast Guard's determination was reasonable and was based on a permissible construction of the relevant statute, the Port and Tanker Safety Act. Accordingly, summary judgment is appropriate in favor of the defendants and the intervenor defendants.

**A. The Coast Guard's Interpretation of Whether Required Ballast Tanks Were "Installed" Is Entitled to Chevron Deference.**

Because this civil action involves an executive agency's interpretation of a statute that it is charged with administering,

we begin with an analysis of the proper level of deference to accord the agency's determination. In Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), the Supreme Court established a framework for according such deference, explaining that if Congress "has directly spoken to the precise question at issue" and its intent is clear, then the "court, as well as the agency, must give effect to [that] unambiguously expressed intent." Id. at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue," then the court must defer to the agency's interpretation as long as it is "based on a permissible construction of the statute." Id. at 843.

Under Chevron, a court may not "simply impose its own construction on the statute." Id. Rather, "Chevron's premise is that it is for agencies, not courts, to fill . . . gaps" in statutes they are empowered to administer. Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 982 (2005). This is because such gap-filling "involves difficult policy choices that agencies are better equipped to make than courts," id. at 980, especially in "technical and complex" fields. Chevron, 467 U.S. at 865. Particular deference is therefore given to an agency with regard to technical matters within its area of expertise, see Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87, 103 (1983), and an agency is permitted "to rely on the reasonable opinions of its own qualified experts even

if, as an original matter, a court might find contrary views more persuasive," Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989).

As a threshold matter, the Coast Guard is entitled to Chevron deference in this case because it has "authority to make rules carrying the force of law," and "the agency interpretation claiming deference was promulgated in the exercise of that authority." United States v. Mead Corp., 533 U.S. 218, 226-27 (2001). The Coast Guard has been delegated express authority to prescribe regulations for the alteration of vessels to which the Port and Tanker Safety Act applies. See 46 U.S.C. § 12101 et seq. (providing that the power to administer vessel documentation laws is vested in the "Secretary of the department in which the Coast Guard is operating" and authorizing the Secretary to "prescribe regulations to carry out the provisions of this subtitle"); see also 46 U.S.C.A. § 3703(a)(stating that "[t]he Secretary shall prescribe regulations for the design, construction, alteration, repair, maintenance, operation, . . . and manning of vessels to which this chapter applies" and that "[t]he Secretary may prescribe different regulations applicable to vessels engaged in the domestic trade"); 46 U.S.C. § 2104 (authorizing the Secretary to delegate duties and powers to the Coast Guard).

The Secretary of Homeland Security, under whom the Coast Guard now operates, has exercised its powers under 46 U.S.C. § 2104 to delegate authority over vessel documentation to the

Commandment of the Coast Guard, which has in turn delegated that authority to the Director of the Coast Guard's National Vessel Documentation Center ("NVDC"). See Dep't of Homeland Sec. Delegation No. 0170.1; 33 C.F.R. § 1.05-1; 46 C.F.R. § 1.01-10(b)(1)(ii)(D). The NVDC made the ultimate determination at issue here regarding the Seabulk Trader's certificate of documentation with a coastwise endorsement. As a consequence, there can be no dispute that the agency acted with the requisite authority in making its determination.

Moreover, the agency's decisional process involved sufficient indicia of formality to trigger the application of Chevron deference. See Mead, 533 U.S. at 231 ("[T]he want of [notice and comment rulemaking] does not decide the case"); NationsBank of N.C. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 256-57, 263 (1995) (holding that Chevron deference can be afforded to informal adjudications, including decisions made on an ex parte application). During the remand proceedings, the Coast Guard provided all parties with the opportunity to present evidence and arguments - an opportunity of which the parties took full advantage, submitting half-a-dozen such filings. The NVDC also relied upon the technical expertise of the Naval Architecture Division ("NAD") to analyze and interpret the parties' submissions. Finally, the agency's twelve-page written ruling is binding and was the basis for the issuance of a coastwise endorsement to the Seabulk Trader. The Coast Guard's

-21-

determination therefore represents a proper occasion for the
application of Chevron deference, and the agency's decision must
be upheld unless its determination is found to be unreasonable or
contrary to the "unambiguously expressed intent" of Congress.
Chevron, 467 U.S. at 843.

## B. The PTSA is Silent or Ambiguous on the Specific Issue of What Constitutes a Prohibited Foreign "Installation."

The first step of the Chevron analysis requires an inquiry
into whether the statute is "silent or ambiguous with respect to
the *specific issue*" for which the agency has offered an
interpretation or regulatory construction. Id. (emphasis added).
In this case, that specific issue is the meaning of
"install[ation]" of segregated ballast tanks in the PTSA, 46
U.S.C. § 3704 - a matter on which Congress has not "directly
spoken," Chevron, 467 U.S. at 842.

The PTSA makes clear only that "[a] segregated ballast tank
. . . required by [this] chapter or a regulation prescribed under
this chapter, on a vessel entitled to engage in coastwise trade
. . . shall be installed in the United States." 46 U.S.C. § 3704.
However, nowhere within § 3704 itself, nor any more generally
applicable statute, has Congress defined what it means to
"install" a segregated ballast tank.[10] Even relying on the plain

---

[10] OSG argues that this Court previously found 46 U.S.C.
§ 3704's installation provision to be clear on its face. See Br.
in Supp. of Mot. of Pl. OSG for Summ. J. at 14. However, the
Court held only that the statute is "pellucidly clear" in the
sense that *any* installation of a required segregated ballast tank
- whether an original installation or a subsequent installation -

-22-

meaning of the word "installed" does not resolve the matter. "Install" means "[t]o place in a position for service or use," Oxford English Dictionary (2d ed. 1989), but the PTSA does not specify whether the walls of the tank itself must be placed into a position for service or use, as the Coast Guard and intervenor defendants argue, or whether, as plaintiff OSG contends, it is sufficient for piping and valve work to be done to reconfigure or convert a pre-existing tank, thereby placing it into a position for new service or use as a *segregated ballast* tank.

Congress, of course, could have specifically defined what it means to install segregated ballast tanks, and could have clarified in the text of the statute itself whether foreign conversion and reconfiguration projects of the sort undertaken on the Seabulk Trader count as prohibited installations. Congress, however, did not. Instead, it elected to leave an interpretational gap regarding the "installed" provision of § 3704, trusting the Coast Guard to evaluate and apply that provision in the exercise of its considerable experience and

is governed by 46 U.S.C. § 3704 and must be performed in the United States or the vessel will lose its coastwise privileges. Shipbuilders I, 551 F. Supp. 2d at 458. Moreover, although the April 24, 2008 Memorandum Opinion cited to the plain meaning of the word "install" as "[t]o place in a position for service or use," it explicitly declined to address whether the type of work performed in this case constituted a prohibited installation under that definition. Rather, the matter was remanded to the Coast Guard for further factual development, because "[w]hether or not a ballast tank has been 'installed' on a vessel requires the factfinder to collect specific information about the work performed on that tank to place it in a position for service." Id.

-23-

expertise. See Lopez v. Davis, 531 U.S. 230, 231 (2001) (noting that to the extent that Congress leaves statutory gaps, deference is owed to the agency's gap-filling interpretations); see also Am. Haw. Cruises v. Skinner, 713 F. Supp. 452, 464 (D.D.C. 1989) (recognizing that "Congress knows how to legislate in minute detail when necessary").

Because Congress has not directly resolved the "precise question at issue" in this case, Chevron, 467 U.S. at 842, we will move to Chevron's second step and examine the reasonableness of the Coast Guard's interpretation.

## C. The Coast Guard's Interpretation of 46 U.S.C. § 3704 is Eminently Reasonable.

The second step of the Chevron analysis requires the Court to determine whether the agency's interpretation of the disputed statutory language was "reasonable" and a "permissible construction of the statute." Chevron, 467 U.S. at 843. In this case, the Coast Guard acted reasonably in concluding that the relatively minimal piping and valve work done on the pre-existing Nos. 1 and 6 cargo tanks of the Seabulk Trader to reconfigure them into segregated ballast tanks did not constitute an installation of required segregated ballast tanks in violation of 46 U.S.C. § 3704. As such, the agency's decision was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and plaintiff's challenge under the APA fails as a matter of law.

-24-

### 1. The agency's interpretation accords with the text of the PTSA.

As noted above, the plain and ordinary meaning of "install" is "to place in a position for service or use." Plaintiff argues that the Nos. 1 and 6 tanks were "installed" outside of the United States because when the Seabulk Trader arrived in the Chinese shipyard, those tanks were not capable of being used as segregated ballast tanks, but by the time the vessel departed, they were. However, plaintiff's argument stretches the definition of "install" too far, and fails to give adequate weight to the full text of 46 U.S.C. § 3704, which prohibits the foreign installation of "segregated ballast tanks." Id. (emphasis added).

A "tank" is defined in the relevant implementing regulations as "an enclosed space that is formed by the permanent structure of a vessel, and designed for carriage of liquid in bulk." 33 C.F.R. § 157.03. In this case, however, the Coast Guard - relying on the expertise of the NAD - found that the process of rendering tanks Nos. 1 and 6 fit for segregated ballast service merely entailed "removal of deep well cargo pumps, and . . . installation of a new piping section and one control valve." A.S. at 185. Crucially, "[n]o tank vent or structural modifications were necessary," and "the only installation work done in a foreign shipyard . . . was unrelated to the [Nos. 1 and 6] tanks themselves." Id.; see also id. at 186. Indeed, the walls and other structural elements of the Nos. 1 and 6 tanks were already in place, having been previously installed in the United States in 1981 by means of work

performed by United States shipbuilders.

Accordingly, the undisputed facts establish that, at least
with respect to the Nos. 1 and 6 tanks, no "enclosed space . . .
formed by the permanent structure of a vessel, and designed for
carriage of liquid in bulk" was *placed* into a position for service
or use by foreign workers in a foreign shipyard.[11]  Rather, the
only apparatus that was placed on, or added to, the Seabulk Trader
to convert the Nos. 1 and 6 wing tanks to segregated ballast
service was the piping and a single valve.  As such, the Coast
Guard's determination that no necessary segregated ballast tanks
were installed in violation of § 3704 was eminently reasonable.

### 2.   The legislative history of § 3704 supports the Coast Guard's interpretation.

The agency's construction of § 3704 is also consistent with
the congressional purpose behind the statute, which was to place
the installation of segregated ballast tanks in the same league as
a vessel rebuild or major conversion under the Second Proviso to
the Jones Act.  As the committee report leading to the PTSA's
enactment explained:

> The committee believes that vessels which are accorded
> the privilege of engaging in the restricted U.S.
> coastwise trade should be required to have these new

---

[11]   The Nos. 2, 3, 4, and 5 wing tanks, by contrast, were
installed outside of the United States; they were created by the
installation of new inner sides, meaning that the enclosed spaces
capable of carrying liquid in bulk were placed into a position
for service or use by foreign work.  See A.S. at 185.  However,
the undisputed facts establish that those wing tanks were not
necessary to meet the vessel's required segregated ballast
capacity.  Id.  Accordingly, the foreign installation of those
tanks did not violate 46 U.S.C. § 3704, either.

installations [of required segregated ballast tanks]
accomplished in the U.S. shipyards, similar to a
requirement for such vessels which are to be rebuilt.
While, technically speaking, it can be argued that
these changes may not constitute major conversions or
rebuilding, they are sufficiently similar to justify
the same requirement.

H.R. Rep. 95-1384(I), 95th Cong., 2d Sess. 22 (1978), as reprinted
in 1978 U.S.C.C.A.N. 3270, 3291.

    The legislative history thus makes clear that § 3704's
prohibition on the foreign installation of segregated ballast
tanks was enacted to reserve for domestic shipyards work that
Congress understood would be of a magnitude comparable to that
involved in a vessel rebuild or a major conversion of the vessel's
hull or superstructure. In short, the purpose of § 3704 of the
PTSA, just as the Second Proviso to the Jones Act, was to help
maintain and support domestic *shipbuilding* and ship repair
capabilities. In this case, however, the piping and valve work
done on the Seabulk Trader's No. 1 and No. 6 tanks was not
"sufficiently similar" to a vessel rebuild or major conversion,
nor did it require any alterations to the structure of the hull
and tanks themselves. Under these circumstances, the Coast
Guard's decision not to extend § 3704's prohibition to the foreign
work at issue here was entirely reasonable.

    Plaintiff's primary argument in response is that accepting
the Coast Guard's interpretation would improperly import a de
minimis exception into the PTSA. That is not the case. The PTSA
contains no such de minimis exception, and under its terms, any

foreign installation of a required segregated ballast tank is forbidden, regardless of the size of the tank or the costs incurred in installing it. However, determining whether a tank was actually installed - as opposed to simply converted - necessarily requires some inquiry into the nature and magnitude of the work performed. Here, the minimal work done on the Nos. 1 and 6 tanks of the Seabulk Trader was not even remotely in the same league as a vessel rebuild. The Coast Guard's conclusion that the Seabulk Trader was entitled to a coastwise endorsement was therefore reasonable and fully consistent with the underlying legislative intent. In sum, the agency did not improperly manufacture a de minimis exception to the statute so much as it faithfully applied § 3704 as it was designed to be interpreted: in light of the Jones Act and with an eye to determining whether the work done was "sufficiently similar" to a rebuild or major conversion under 46 C.F.R. § 67.177.

> ### 3. The Coast Guard's interpretation of § 3704 is not contrary to prior interpretations or applicable implementing regulations.

Plaintiff argues that the Coast Guard's interpretation of 46 U.S.C. § 3704 is arbitrary and unreasonable because it conflicts with other implementing regulations and with prior guidance issued by the Coast Guard in a Navigation and Vessel Inspection Circular ("NVIC") and an October 6, 1997 letter ruling. None of plaintiff's arguments, however, is persuasive.

First, plaintiff's contention that the Coast Guard's

-28-

determination is inconsistent with 33 C.F.R. § 157.24a is
unavailing, as that regulation says nothing about the definition
of prohibited foreign installations of segregated ballast tanks.
Instead, § 157.24a merely provides for the submission of
calculations when segregated ballast tanks are installed in
existing vessels. See 33 C.F.R. § 157.24a. Specifically, the
regulation requires, inter alia, that drawings or diagrams of the
pumping and piping systems be provided to the Coast Guard to
ensure that the ballast piping is in fact segregated from the
cargo piping, and that the segregated ballast system complies with
the structural and capacity requirements set forth elsewhere in
the implementing regulations. Id. Nothing in § 157.24a, however,
triggers the application of 46 U.S.C. § 3704, nor does the mere
fact that the Coast Guard requests piping diagrams mean that the
addition of such piping must be considered an "installation" of a
segregated ballast tank for PTSA purposes.

Moreover, OSG's invocation of prior "Coast Guard precedent,"
see Br. in Supp. of Mot. of Pl. OSG for Summ. J. at 17, is equally
unhelpful. Both NVIC 1-81 and the 1997 "letter ruling" cited by
plaintiff were preliminary determinations, and there are no
indications that they were even binding interpretations on the
part of the agency. See, e.g., Mead, 533 U.S. at 233 (finding
that "a letter's binding character as a ruling stops short of
third parties"). In fact, the Coast Guard has made clear that
Navigation and Vessel Inspection Circulars, such as NVIC 1-81, are

issued only for the purpose of providing general guidance and "do not have the force of law." See http://www.uscg.mil/hq/cg5/nvic/ (explaining the nature and effects of such circulars).

Finally, a closer examination of the 1997 letter itself reveals that the Coast Guard did not take any final action on the basis of that letter, and in fact was not even offering any definitive interpretation of 46 U.S.C. § 3704. Rather, the two-paragraph letter reads, in full:

> This is in response to your fax of October 3, 1997 forwarding correspondence sent to the Vessel Compliance Division at U.S. Coast Guard Headquarters concerning the conversion of wing tanks in a single hulled vessel to segregated ballast tanks or water tight void spaces to create double sides for the vessel. Of specific concern is whether such a project, if accomplished outside of the U.S., would result in a loss of coastwise privileges.

> The installation of segregated ballast tanks outside of the U.S. in a tanker of 20,000 deadweight tons or above will result in a lost of coastwise trading privileges. (46 C.F.R. § 67.10(d)(4)). The creation of water tight void spaces outside of the U.S. will not result in a loss of coastwise trading privileges if steel work associated with the conversion of those spaces does not exceed the parameters set forth in 46 C.F.R. § 67.177, regardless of the vessel's deadweight tonnage.

A.S. at 86. The letter therefore appears to have been sent by the Coast Guard in response to a generic hypothetical query, and it contains no specific information about the nature or magnitude of the contemplated "conversion" of segregated ballast tanks. Moreover, the Coast Guard's two-sentence response does little more than paraphrase § 3704 and the relevant regulations, informing the recipient that "[t]he installation of segregated ballast tanks

outside of the U.S. . . . will result in a loss of coastwise trading privileges." Id. The letter takes no position on the precise definition of what constitutes a foreign installation of segregated ballast tanks, and it therefore does nothing to bolster plaintiff's contention that the Coast Guard's decision with respect to the Seabulk Trader was arbitrary or capricious.

## IV. Conclusion

As the courts have long recognized, "[j]udges are not expert in [every] field." Chevron, 467 U.S. at 865. The judicial branch must therefore defer under certain circumstances to the reasonable determinations of the executive agencies, which have developed that expertise by virtue of being charged by Congress "with the administration of the [relevant laws and regulations] in light of everyday realities." Id. at 865-66.

In this case, "the Coast Guard is the interpretive body best positioned to take account of the myriad factors involved in arriving at a reasonable construction of the complex regulatory scheme for coastwise endorsements." Shipbuilders Council of Am., 578 F.3d at 245. The Coast Guard's well-reasoned decision to issue a coastwise endorsement to the Seabulk Trader was supported by the facts in the administrative record, accords with the text and legislative history of the Port and Tanker Safety Act of 1978, and was not arbitrary, capricious, or otherwise contrary to law.

For all these reasons, plaintiff Overseas Shipholding Group's Motion for Summary Judgment [Dkt. No. 214] will be denied, and the

-31-

cross-motions by the defendants [Dkt. No. 217] and intervenor defendants [Dkt. No. 220] will be granted by an Order to be issued with this Memorandum Opinion.

Entered this 17ᵗʰ day of March, 2011.


Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge